## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **JESUS JAVIER PEREGRINO GUEVARA** | **CASE NO.  6:20-CV-01200 SEC P** |
| **VERSUS** | **JUDGE MICHAEL J. JUNEAU** |
| **DIANNE WITTE, ET AL** | **MAGISTRATE JUDGE WHITEHURST** |

### REPORT AND RECOMMENDATION

Before the Court is a petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2241 (Rec. Doc. 1), and Temporary Restraining Order (Rec. Doc. 2), filed by Petitioner Jesus Javier Peregrino-Guevara. Petitioner is an immigration detainee in the custody of the Department of Homeland Security/U.S. Immigration and Customs Enforcement ("DHS/ICE").  He is detained at the Pine Prairie ICE Processing Center (PPIPC) in Pine Prairie, Louisiana. Petitioner seeks release from custody, alleging that he faces an increased risk of severe illness should he contract COVID-19, due to his serious medical condition.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this court.  For the reasons stated below, **IT IS RECOMMENDED** the Petition and Temporary Restraining Order be **GRANTED** requiring the **IMMEDIATE RELEASE** of the Petitioner pending resolution of his immigration proceedings or removal.

## I.    Background

### A. Status of Immigration Detention

Petitioner is a native and citizen of Cuba, who fled after torture and persecution.  R. 1, p. 8.  Upon crossing the Rio Grande into the United States, he promptly sought out border agents and turned himself in to seek political asylum. *Id. at pp. 8-9.*  ICE personnel later interviewed him and concluded that he has a credible fear of persecution.  *Id*. at p. 9.

On October 19, 2019, DHS served Petitioner with Form I-862, Notice to Appear, charging him with removability under sections 212(a)(6)(A)(i) and 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA) as an alien present in the United States without admission or parole and an intending immigrant who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act.  *R. 11-1, ¶ 45.*  On June 30, 2020, an Immigration Judge in Oakdale, Louisiana ordered Petitioner removed from the United States to Cuba based on the charges in the Notice to Appear.  *Id. at ¶ 46.* The respondent appealed this decision to the Board of Immigration Appeals, which remains pending. *Id*.  Upon his initial intake and pursuant to each parole determination, Petitioner was determined to not be a class member as defined in *Fraihat v. ICE* because he does not have a preexisting disease that puts him at an increased risk of COVID-19 complications per CDC guidelines

relating to high-risk individuals. *Id. at ¶ 47.* Petitioner was served with a Notice Regarding Parole Application in accordance with *Mons v. McAleenan* on or about January 10, 2020. *Id. at ¶ 48.* To date, Petitioner has requested three parole determinations from ERO, all of which were denied in accordance with the 2009 ICE Parole Directive. *Id.*

### B. Petitioner's Health Condition

Petitioner submits that he has suffered from kidney problems his entire life, often experiencing pain, difficulty urinating, and blood in his urine. *R. 1, p. 9.* Doctors eventually diagnosed him with kidney stones. *Id.* He received frequent treatment for kidney issues while still living in Cuba. *Id.* He also suffers from a serious kidney disease called acute glomerulonephritis, for which he was diagnosed on February 18, 2019, while still in Cuba. *Id; see also* Cuban Ministry of Public Health Medical Certificate, *R. 2-20.*

Dr. Kate Sugarman reviewed Petitioner's medical certificate from Cuba and opined that "Petitioner's kidney disease is a serious medical condition that makes him a higher risk individual with regard to COVID-19." *R. 2-22.* Acute glomerulonephritis "causes inflammation and damage" to kidneys and Dr. Sugarman opined that "Mr. Peregrino Guevara . . . is suffering from serious and severe kidney disease due to the glomerulonephritis." *Id. at 2.*

-3-

Glomerulonephritis is a condition that inflames and subsequently damages the glomeruli, tiny filters in the kidneys which remove excess fluid, electrolytes and waste from the bloodstream. This causes permanent kidney damage. *Id.* The condition can cause fluid buildup in the lungs and compromise the respiratory system. It is the third most common cause of end-stage kidney failure. *Id.*

Petitioner contends that glomerulonephritis—like his other kidney issues—still actively plagues him, and his condition has worsened during his detention at Pine Prairie. He experiences kidney pain every morning and feels pain and pressure whenever he attempts to crouch down. Declaration of Guevara, *R. 2-2.* He continues to have difficulty urinating and at times, despite feeling the need, has been unable to do so. *Id.*

Petitioner contends that doctors at Pine Prairie know of his issues, as he complained to facility doctors multiple times since he arrived. *Id.* His medical intake form establishes, and the Respondents concede, that doctors knew upon arrival that Petitioner has kidney stones. *R. 2-3.* Doctors have treated him for abdominal and kidney pain, as well as urinary problems, in at least January, April, July, and August.

Respondents, however, contend that Petitioner has not been diagnosed with chronic kidney disease. *R. 11, p. 17.* They contend that while he has been diagnosed with kidney stones, the CDC does not list kidney stones as an underlying medical

-4-

condition that presents an increased risk for a person of any age developing a severe illness from COVID. *Id.* Further, Respondents argue that though the CDC does lists "chronic kidney disease" as a qualifying underlying condition, Petitioner has failed to demonstrate that he has been diagnosed with acute glomularnephritis while at PPIPC, or that CDC classifies acute glomularnephritis as chronic kidney disease. *Id.*

### C. Conditions at PPIPC

While currently reporting no confirmed cases, PPIPC has had 65 total confirmed COVID-19 cases.[1] Respondents argue that they have implemented a comprehensive and evolving pandemic response protocol to protect Petitioner and all detainees. They argue that the success of the response protocol implemented by Respondents is made particularly evident by the lack of any COVID-19 positive cases at PPIPC since the filing of Petitioner's TRO.

Petitioner makes the following allegations related to the conditions at PPIPC, characterizing the Respondents description of safety protocols and conditions at PPIPC as "misleading assertions and canned recitals of safety protocols that lack credibility":

• **Staff Does Not Monitor or Enforce Social Distancing.** Petitioner lives in a dorm with roughly 50, but at least 41 people. Supplemental Declaration of Jesus

---

[1] U.S. Immigration and Customs Enforcement, ICE Guidance on COVID-19: ICE Detainee Statistics, https://www.ice.gov/coronavirus (last accessed November 16, 2020).

Javier Peregrino-Guevara, *R. 14-1 at ¶ 2.*  No one tells detainees to sleep head-to-foot in their bunks and no one enforces such a policy. *Id. at ¶ 3.*  Moreover, Petitioner works in the facility's ten-by-twelve-meter kitchen four times a week, in shifts of up to thirty men.  *Rec. 2-2 at ¶ 14.*

 • **Detainees Receive Poor Quality PPE**. Detainees typically received about one mask a week with no means to clean them.  *Id. at ¶ 21.* The masks are flimsy and fall apart after a few days. *Id*.; see also *R. 2-36*, Laura C. Morel, *Inside ICE Lockup in Louisiana: Face Masks Made of Socks, No Hand Sanitizer, Growing Tensions*, The New Orleans Advocate at p. 13. Mask distribution has recently gotten worse, as Petitioner and his dormmates have not been issued a new mask in almost two weeks.  *R. 14-1 at ¶ 9.*

 • **Staff Does Not Take Proper Safety Precautions**. Petitioner observes guards without masks, or wearing them improperly, even while he is on the phone with counsel. *R. 2-2 at ¶¶ 23, 29.*  News reports show that guards will not even keep masks on when overseeing detainees that are suspected of carrying COVID-19.  *See R. 2-34*, Rosemary Westwood, 'They Don't Care About Anything' Inside a COVID-19 Outbreak at One Louisiana ICE Facility, Crescent to Capitol at p. 3.  Guards are also seen without gloves on.  *R. 2-2 at ¶ 23*. Moreover, they frequently move about the general population and the ostensibly quarantining detainees.  *Id*. at ¶ 24.

- **Detainees Are Not Placed in Negative Pressure Rooms**. Pine Prairie might have negative pressure rooms, but it often does not use them. When he was suspected of having COVID19, staff merely put Petitioner in a normal room by himself. *Id. at ¶ 25*. While inside, he received no medical attention. *Id. at ¶ 26*. He is not alone. *R. 2-37*, Carmine Molina Acosta, *Psychological Torture: ICE Response to COVID-19 With Solitary Confinement*, The Intercept, at p. 5 (detainees in supposedly "medically isolated cells" "being denied opportunities to shower and receive medical attention.").

- "**Cohorting" Means Confining Potentially Sick Men with Healthy Ones**. Detainees are "cohort[ed]" (Ladwig Declaration, *R. 11-1 at ¶ 28*), a term for locking COVID-19-exposed people together in a room so they can infect only each other. This of course does no good for the men trapped inside the room. Cohorting has happened to Petitioner as well. *R. 2-2 at ¶ 29; R. 11-1 at ¶ 28–29*.

- **"Quarantining" Detainees Are Left Among the Healthy Population**. News articles recount a detainee's report that while still in "isolation," the "guards brought him to the phone booth for a call with his lawyer and left him for an hour around people who hadn't tested positive for COVID-19." *R. 2-34*.

- **Staff Does Not Sanitize Dorms**. Pine Prairie staff does not "sanitize . . . [dorms] 4 times per shift with a sanitizing spray" (as alleged in *R. 11-1 at ¶ 32*), because they do not sanitize dorms at all; staff does not enter the dorms and leave

cleaning them entirely up to the detainees, who are not provided with alcohol-based cleaners (*R. 2-2 at ¶ 15; R. 14-1 at ¶ 10*).  Further, PPIPC has been known to empty dorms used for "cohorts" and replace them with general dorm residents as punishment—without cleaning them—and before the 14- day quarantine period is over.  *R. 1 at ¶ 47.*

> • **Pine Prairie Does Not Always Quarantine or Test People Entering the Facility**. After Hurricane Laura, ICE transferred detainees from facilities in affected areas—including those facilities know to have COVID-19 outbreaks—directly into Pine Prairie's general population, without quarantining the new arrivals.  *Id. at ¶ 38.* Additionally, on October 14, Petitioner left the facility for a medical appointment and he was not tested for COVID-19 when he returned to Pine Prairie. R. 14-1 at ¶ 8.

## II.    Law & Analysis

Petitioner does not challenge his underlying immigration or removal proceedings, nor does he seek corrective relief for the specific conditions of his confinement.  Rather, he argues that in light of the serious risk of long-term injury, even death, posed by Covid-19, his continued detention violates his due process.

### A. Jurisdiction

"Federal courts must resolve questions of jurisdiction before proceeding to the merits." *Ashford v. United States*, 463 F. App'x 387, 391-92 (5th Cir. 2012).

Petitioners assert that this Court has habeas corpus jurisdiction pursuant to 28 U.S.C. § 2241(c)(3), which states that a district court may grant a writ of habeas corpus where an individual is "in custody in violation of the Constitution or laws or treaties of the United States."

Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus. *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). The Supreme Court clarified that although "Congress has enacted statutory provisions that limit the circumstances in which judicial review of deportation decisions is available . . . it does not deprive an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority." *Zadvydas v. Davis,* 533 U.S. 678, 688 (2001). Because Petitioner challenges the "fact or duration of confinement," his claims are "properly brought under habeas." *Poree v. Collins*, 866 F.3d 235, 243 (5th Cir. 2017); *see also Njuguna v. Staiger*, No. 6:20-cv 00560, 2020 WL 3425289, at *9 (W.D. of La. June 22, 2020) ("A detainee may, and should, assert fact or duration claims under § 2241")(internal quotes omitted).

Respondents argue that habeas cannot be used to challenge conditions of confinement.  However, civil rights statutes are not "the exclusive avenue by which to attack conditions of confinement," and there is no bar to a habeas suit seeking release due to inadequate conditions of confinement. *Coleman v. Dretke*, 409 F.3d 665, 670 (5th Cir. 2005). "The mere fact that Plaintiffs' constitutional challenge

requires discussion of conditions in immigration detention does not necessarily bar such a challenge in a habeas petition." *Vazquez Barrera v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497, at \*4 (S.D. Tex. Apr. 17, 2020). Habeas is appropriate as Petitioner is "challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment." *Preiser*, 411 U.S. at 500 (1973); see *Carson v. Johnson*, 112 F.3d 818, 820 (5th Cir. 1997)(recognizing habeas is appropriate if a favorable ruling would "automatically entitle [the petitioner] to accelerated release"). In challenges related to COVID-19, "[p]etitioner[] reference[s] 'conditions' associated with [his] detention only to establish that the fact of detention is no longer 'reasonably related to a legitimate government objective,'" is "punitive" under the circumstances, and he "seek[s] relief available traditionally, if not only, through habeas corpus: release." *Dada v. Witte*, 1:20-cv-00458, Dkt. 17, Slip. Op. at 12 (W.D. La. Apr. 30, 2020).

Courts, including this one, have concluded that those "who are at elevated risk of contracting COVID-19 in a detention facility, and who seek immediate release, may do so through 'fact or duration' claims asserted under 28 U.S.C. § 2241." *Id*. at pp. 14- 15 & 14 n.14 (citing examples); *see also Vazquez Barrera*, 2020 WL 1904497, at \*4 (holding that immigration detainees properly petitioned under 28 U.S.C. § 2241 to challenge "the validity of their continued confinement" during

-10-

the COVID-19 epidemic); *Malam v. Adducci*, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020) ("[W]here a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions of her confinement and is therefore cognizable in habeas."); *Dada*, Slip. Op. at 16 (finding that detainees vulnerable to contracting COVID-19, who seek immediate release, may do so through fact and duration claims asserted under Section 2241); *Njuguna*, 2020 WL 3425289, at *9 ("Because Petitioner challenges the validity of confinement and because he seeks immediate release from confinement as the remedy, his claims were properly brought 28 U.S.C. §2241 and the Court has jurisdiction to rule on his petition of writ of habeas corpus"). Accordingly, this Court agrees with Petitioner's argument that the challenge to his continued detention is cognizable in a habeas action.

## B. Temporary Restraining Order

To obtain a temporary restraining order, Petitioner must establish by a preponderance of the evidence: (1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat that irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) granting the injunction will not disserve the public interest. *Karaha Bodas Co. v. Perusahaan Pertambangan*, 335 F.3d 357, 363 (5th Cir. 2003).

This standard is a difficult and stringent one for the movant, and the movant bears the burden of establishing each element. *Whitaker v. Livingston*, 732 F.3d 465 (5th Cir. 2013). The Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009). "The failure of a movant to establish one of the above four elements will result in the denial of a motion[.]" *Medlin v. Palmer*, 874 F.2d 1085, 1091 (5th Cir. 1989).

### a. There is a likelihood of success on the merits.

Petitioner has stated a due process claim based on Respondents' conduct in subjecting Petitioner, a civil detainee, to conditions that amount to punishment, in violation of his Fifth Amendment rights.

Civil immigration detainees are specifically entitled to the protections of the Fifth Amendment to the United States Constitution. Its Due Process Clause, in relevant part, forbids the government to "depriv[e]" any "person . . . of . . . liberty . . . without due process of law." Civil detention thus implicates the Due Process Clause: "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful,

temporary, or permanent." *See id*. at 693. The Supreme Court has long held that civil detention must be justified: "[G]overnment detention violates that Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, or, in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification, such as harm threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id*. at 690 (internal citations and quotations omitted). Civil detention becomes unconstitutional when "punitive" in nature, meaning "not [or no longer] reasonably related to a legitimate, nonpunitive governmental objective." *Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997). Thus, it is well settled that a civil immigration detainee is "the equivalent of a pretrial detainee," whose "constitutional claims are considered under the due process clause instead of the Eighth Amendment." *See Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000).[2]

Conditions of civil confinement constitute impermissible punishment and violate due process when they bear "no reasonable relationship to a legitimate government interest." *Duvall v. Dallas Cty., Tex.,* 631 F.3d 203, 207 (5th Cir. 2007). This includes conditions that expose detainees to heightened risk of contracting a

---

[2] On October 22, 2020, Respondents alerted to this Court to, and quoted from, the Fifth Circuit's decision in *Valentine v. Collier*, 2020 WL 6039993. Rec. Doc. 14. The Court agrees with the Petitioner's position that the Fifth Circuit's decision does not change this case, as *Valentine* concerns a convicted criminal's ability to state an Eighth Amendment violation. Mr. Peregrino-Guevara is an immigration detainee, and thus the Fifth Amendment Due Process standard governs his claim. S*ee Edwards v. Johnson, supra.*

dangerous infectious disease. *See id.* (continued housing of inmates while failing to take "well-known steps" to prevent spread of infectious disease violated due process). To separate meritorious claims from generalized risk, some courts have focused upon underlying detainees' medical conditions, detainees' criminal histories or tendency toward violence, and the detention facility's response to the pandemic. *Dada, supra (citing Vazquez Barrera*, 2020 WL 1904497, at \*6). Another court distilled a "nonexhaustive list of factors" to be considered. *Id. (citing Saillant v. Hoover,* No. 1:20-CV-00609, 2020 U.S. Dist. LEXIS 67451, 2020 WL 1891854 (M.D. Pa. Apr. 16, 2020), at \*4. This Court will follow *Dada* and reconcile those approaches.

In addressing the merits of Petitioner's request for habeas relief, the undersigned thus considers the following non-exhaustive list of factors:

(1)    whether the petitioner has been diagnosed with COVID-19 or is experiencing symptoms consistent with the disease;

(2)    whether the petitioner is among the group of individuals that is at higher risk of contracting COVID-19 as identified by the CDC, due to the petitioner's age or an underlying health condition;

(3)    whether the petitioner has been, or has likely been, directly exposed to COVID-19;

(4)    the physical space in which the petitioner is detained, and how that physical space affects his risk of contracting COVID-19;

(5)    the efforts that detention facility officials have made to prevent or mitigate the spread of, or harm caused by, COVID-19;

(6)  any danger to the community, or to the petitioner's immigration proceedings, that may be posed by the petitioner's release; and

(7)  any other relevant factors.

*See Dada, supra (citing Saillant*, 2020 WL 1891854, at *4; *Vazquez Barrera*, 2020 WL 1904497, at *6).

COVID-19 poses a heightened threat of serious illness, long-term injury, and possible death if Petitioner remains in a crowded congregate setting. Despite Respondents' arguments, this Court finds that Petitioner is among those at higher risk of contracting COVID-19 as identified by the CDC.  The CDC recognizes those with chronic kidney disease are at an increased risk for severe illness resulting from COVID-19. See CD*C, People Who Are At Increased Risk for Severe Illness,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-athigher-risk.html (last visited 11/16/2020).

Dr. Kate Sugarman reviewed Petitioner's medical records and opined on his diagnosis. *R. 2-22.*  Petitioner notes that while Respondents criticized the fact that she is not actively treating him and did not draw on his most recent medical records, they also do not engage the substance of her opinion.  Acute glomerulonephritis "causes inflammation and damage" to kidneys and Dr. Sugarman opined that "Mr. Peregrino Guevara . . . is suffering from serious and severe kidney disease due to the glomerulonephritis.  *Id. at p. 2.*  Indeed, glomerulonephritis is "inflammation and subsequent damage of the glomeruli" (*id*.) which are the "membrane tissue in the

-15-

kidney that serves as a filter, separating wastes and extra fluid from the blood"—thereby reducing renal function (*R. 2-21*), which is an attendant effect of chronic kidney disease.  Petitioner's medical visits at Pine Prairie show that he has consistent pain in his kidneys and bladder. *R. 11-1 at pp. 6–8.*  Respondents contend that this is merely as a case of kidney stones.  However, this Court finds persuasive Dr. Sugarman's opinion, that Petitioner's ongoing kidney problems at PPIPC, coupled with his prior medical issues, show that he suffers from a chronic kidney condition that renders him medically vulnerable.

With respect to the next factor, Respondents admit that Petitioner has been exposed to COVID-19 at least once.  *R. 11 at ¶ 28* (describing using "cohorts" for asymptomatic detainees "[i]n cases of known exposure to a person with confirmed COVID-19"); *id at ¶ 42* ("On April 23, 2020 the Petitioner was cohorted for COVID-19.")

Regarding the physical space in which the petitioner is detained, and how that physical space affects his risk of contracting COVID-19, Petitioner lives in a dorm with roughly 50, but at least 41 people.  *R. 14-2 at ¶ 2.*  No one tells detainees to sleep head-to-foot in their bunks and no one enforces such a policy. *Id*. ¶ 3.  Moreover, he works in the facility's ten-by-twelve-meter kitchen four times a week, in shifts of up to thirty men. *R. 2-2 at ¶ 14.*

Next, the Court finds the efforts that PPIPC officials have made to prevent or mitigate the spread of, or harm caused by, COVID-19, lacking.  Detainees are "cohort[ed]" (*R. 11-1 at ¶ 28*), a term for locking COVID-19-exposed people together in a room so they can infect only each other. This Court agrees with Petitioner's contention that this arrangement does no good for the men inside the room.  Cohorting has happened to Petitioner as well.  *R. 2-2 at ¶ 29; R. 11-1 at ¶ 28–29*.  Furthermore, as the news article cited above by Petitioner recounts, a detainee while still in "isolation," was brought to the phone booth by guards for a call with his lawyer and left for an hour around people who hadn't tested positive for COVID-19. *R. 2-34 at p. 3*.   Finally, Petitioner contradicts Respondent's contention that Pine Prairie staff "sanitize[s] . . . [dorms] 4 times per shift with a sanitizing spray" (*R. 11 at ¶ 32*), declaring, instead that they do not sanitize dorms at all.  Rather, he alleges that the staff does not enter the dorms and leaves cleaning them entirely up to the detainees, who are not provided with alcohol-based cleaners. *R. 2-2 at ¶ 15; R. 14-1 at ¶ 10.* Further, PPIPC has been known to empty dorms used for "cohorts" and replace them with general dorm residents as punishment—without cleaning them—and before the 14-day quarantine period is over. *R. 1, ¶ 47.*  Finally, Petitioner alleges that PPIPC does not always quarantine or test people entering the facility, evidenced by the fact that detainees transferred from facilities in areas affected by Hurricane Laura—including those facilities known to have COVID-19

outbreaks—directly into Pine Prairie's general population, without quarantining the new arrivals (*id.*), and by the fact that on October 14, 2020, Petitioner left the facility for a medical appointment and was not tested for COVID-19 when he returned to Pine Prairie. *R. 14-1, ¶ 8.*

Finally, the last factor favors Petitioner's release. He is a math teacher, not a criminal, as Respondents also admit *(R. 11, p. 24)*— and not a mandatory detainee— and thus he is no threat to the community. Additionally, releasing him does not imperil his immigration proceedings. ICE itself has determined that Petitioner is not a flight risk. *R. 2-41.* Respondents argue that he is more likely to "abscond" because he is appealing an adverse ruling from the immigration judge, but the Court agrees that this speculation is untethered to facts. According to a relevant study, 93% of non-detained [immigrants] with counsel—like Mr. Peregrino-Guevara — "show up to court" for their immigration hearings. *See* Ingrid V. Eaglyd & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 57, 73 (2015). Furthermore, if released, ICE would know Petitioner's exact location, as he will stay with family. *R. 2-42.*

### b. There is a substantial threat that irreparable injury will result if the injunction is not granted.

In order to satisfy the "irreparable harm" requirement, Petitioner must establish that "irreparable injury is likely in the absence of an injunction." *Dada, supra* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). But a

court "need not await a tragic event" to afford injunctive relief.  *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)).  Instead, the following familiar principals would apply:

> Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."  11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2013) [hereinafter Wright & Miller]. The focus of this inquiry is not so much the magnitude but the irreparability of the threatened harm. *See Callaway,* 489 F.2d at 575. The Fifth Circuit has defined irreparable harm to mean "harm for which there is no adequate remedy at law," such as monetary damages. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 585 (5th Cir.2013); *accord Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir.2011).
>
> Plaintiffs must show that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Id*. (alteration in original) (quoting Wright & Miller, supra, § 2948.1); *Morrell v. City of Shreveport*, 536 Fed.Appx. 433, 435 (5th Cir.2013). There must be more than "an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir.1985). Accordingly, the party seeking a preliminary injunction must show that the threatened harm is "more than mere speculation." *Janvey*, 647 F.3d at 601.  Therefore, "[a] presently existing actual threat must be shown." *Morrell*, 536 Fed.Appx. at 435 (alteration in original) (quoting *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir.2001)).

*Dada, supra, (*quoting *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582–83 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao,* 678 F. App'x 250 (5th Cir. 2017)).

Here, a Petitioner could establish irreparable harm in two ways. First, "[t]he alleged violation of a constitutional right is sufficient for a court to find irreparable harm." *Dada, supra* (citing *Malam*, 2020 WL 1672662, at *10). Second, a Petitioner may prove that detention constitutes a significant and heightened risk that they will contract COVID-19. *Id*. (citing *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *13 (D. Md. Apr. 3, 2020) ("Petitioners have introduced uncontroverted evidence that contracting COVID-19 would put them at serious risk of severe medical complications and even death."). It is difficult to dispute that an elevated risk of contracting COVID-19 poses a threat of irreparable harm. See, e.g., *Thakker, et al. v. Doll*, et al., No. 1:20-CV-480, 2020 WL 1671563, at *7 (M.D. Pa. Mar. 31, 2020) (collecting data and cases).

The court in *Vazquez Barrera, supra,* described the general implications upon immigration detainees with comorbidities as follows:

> The COVID-19 pandemic has reached every state in our nation, and the numbers of infected and dead increase daily. According to the CDC, those with particular medical vulnerabilities, including Plaintiffs, are particularly susceptible to serious illness and death. There is currently no vaccine or cure for COVID-19. Medical experts have also concluded that continued detention in ICE facilities during the current pandemic presents an "imminent risk to the health and safety of immigrant detainees." Letter from Scott A. Allen, MD, FACP & Josiah Rich, MD, MPH to Committee Chairpersons and Ranking Members of House and Senate Committee on Homeland Security and Committee on Oversight and Reform 3 (Mar. 19, 2020), https://whistleblower.org/wpcontent/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-toCongress.pdf.

*Vazquez Barrera*, 2020 WL 1904497, at *6; see also *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) ("Courts have also recognized this health risk to be particularly acute—and of constitutional significance—for inmates who are elderly or have underlying illnesses.").

Accordingly, the Court finds that due to his chronic kidney illness, there is a significant and heightened risk that he experiences severe illness should he contract Covid-19, thereby suffering irreparable injury if the injunction requested is not granted.

### c. The threatened injury outweighs the threatened harm.

As articulated by the Court in *Dada*, the potential injuries facing Petitioner are of the gravest kind. Those who contract Covid-19 often suffer physically and mentally, enduring severe and protracted illness, discomfort, and pain. They may suffer permanent injuries, disabilities, or death. Respondents have legitimate countervailing interests: to protect the public and to ensure that Petitioner appears for future immigration proceedings or removal. *See Vazquez Barrera*, 2020 WL 1904497, at *7. The Court acknowledges and values those interests. However, their weight is limited in several respects:

> [D]etention is not necessary to further Defendants' interest in preventing [detainees] from absconding. Rather, ICE has a number of alternative tools available to it to ensure enforcement, which it is free to use with [detainees] if they are released from detention. For example, ICE's conditional supervision program uses a combination of electronic ankle monitors, biometric voice recognition software, unannounced

home visits, employer verification, and in-person reporting requirements to supervise individuals released from detention. (Doc. No. 12-1, at 27). An initial study of ICE's alternatives to detention reported a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings among supervised individuals. U.S. Gov't Accountability Office, GAO-15-26, Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness 30 (2014).

*Vazquez Barrera,* 2020 WL 1904497, at *7. To the contrary, a Petitioner's extended detention may actually place added strain on the already overburdened medical system, or delay, if not derail, immigration proceedings or deportation. *Ali v. Dep't of Homeland Sec.*, No. 4:20-CV0140, 2020 WL 1666074, at *5 (S.D. Tex. Apr. 2, 2020) ("If Petitioner endured significant exposure to those affected by the virus, that alone could further delay Petitioner's ultimate deportation.").  Therefore, this Court finds that Petitioner's likely injuries outweigh the government's interests.

### d.  Granting the injunction will not disserve the public interest.

Finally, courts have referenced a detainee's criminal history and history of violence as public interest factors. *Vazquez Barrera*, 2020 WL 1904497, at *7. Of course, a detainee's criminal history cannot be decisive, because civil detention cannot masquerade for continued criminal detention for a prior offense. *Id*. Courts have also noted the public's interest in preventing or mitigating outbreaks, which invariably spread to correctional officers and other staff members, their families, and the public. *Dada*; see also *Vazquez Barrera*, 2020 WL 1904497, at *7; *Thakker*, 2020 WL 1671563, at *8 ("Physical detention itself will place a burden on

-22-

community healthcare systems and will needlessly endanger Petitioners, prison employees, and the greater community. We cannot see the rational basis of such a risk."). And yet again, the public interest may, in some situations, favor release: "In the highly unusual circumstances posed by the COVID-19 crisis, the continued detention of aging or ill civil detainees does not serve the public's interest . . ." *Dada*, *supra*. "To the contrary, public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions." *Basank*, 2020 WL 1481503, at *6.

Petitioner represents to the Court that if released, he can reside with his cousin, an American citizen living in Florida since 2005. *R. 2-42, p. 4.* The Court finds that he does not pose a danger to the community, as he does not have any criminal convictions in Cuba or the United States.

Accordingly,

**IT IS RECOMMENDED** that the Court **GRANT** the Petition for Writ of Habeas Corpus (rec. doc. 1) and the Motion for Temporary Restraining Order (Rec. Doc. 2), requiring the **IMMEDIATE RELEASE** of Petitioner  pending resolution of his immigration proceedings or removal, and under conditions to be specified by DHS/ICE but to exclude subsequent arrest and detention, unless he violates a condition of release, attempts to abscond, or commits any criminal offense.

**IT IS FURTHER RECOMMENDED** that the Court decline to require any Petitioner released to post a bond or other security. See Fed. R. Civ. P. 65(c); *A.T.N. Indus., Inc. v. Gross,* 632 F. App'x 185, 192 (5th Cir. 2015) ("[U]nder Rule 65(c), a court may elect to require no security at all.")(internal citation and quotation omitted).

**IT IS FURTHER ORDERED** that, given the urgency of the relief sought and recommended above, the objections periods set forth in 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b) be **EXPEDITED,** and that any party wishing to object to this Report and Recommendation do so on or before Friday, November 20, 2020. The District Judge will consider timely objections before issuing a final ruling. A party's failure to file written objections to the proposed factual findings, conclusions, and recommendations contained in this Report and Recommendation shall bar that party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in Chambers this 17th day of November, 2020.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE